IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RAYSEAN BARBER, | 8:20CV282 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| SCOTT FRAKES, DR. SEAN THOMAS, CYNTHIA POLAGE, DR. JEFF MELVIN, DR. BRANDON HOLLISTER, DR. JEFFERY KASSELMAN, DR. NATALIE BAKER, DR. MERIDITH GRIFFIN, DR. AGNES STAIRS, DR. SEAN SEARS, DR. JASON OURADA, DR. YVONNE WESTOVER, DR. SARAH HOFF, and DR. DOUGLAS MORIN, | |
| Defendants. | |

Plaintiff, Raysean Barber ("Barber"), a state prisoner currently incarcerated at the Lincoln Correctional Center ("LCC"), filed a Second Amended Complaint with leave of court on February 22, 2021.[1] (Filing 14). The court will now review this pleading to determine whether the case should proceed to service of process, or whether it should be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A.

---

[1] Barber's original Complaint (Filing 1) was filed on July 16, 2020. Barber was granted leave to proceed in forma pauperis, and he paid the required initial partial filing fee. In a lengthy Memorandum and Order entered on October 13, 2020 (Filing 10), the court determined the Complaint was subject to preservice dismissal for failure to state a claim upon which relief may be granted, but on its own motion gave Barber leave to amend. Barber filed an Amended Complaint (Filing 11) on October 29, 2020, but subsequently requested leave to file a Second Amended Complaint in order to add parties and to allege additional facts. The court granted this request on January 27, 2021, and consequently did not conduct an initial review of the Amended Complaint.

# I. LEGAL STANDARDS ON INITIAL REVIEW

The Prison Litigation Reform Act ("PLRA") requires the court to conduct an initial review of "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). On such initial review, the court must dismiss the complaint if it: "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). *See also* 28 U.S.C § 1915(e)(2)(B) requiring dismissal of in forma pauperis complaints "at any time" on the same grounds as § 1915A(b)).

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). "A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs must set forth enough factual allegations to "nudge[ ] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"A pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted). This means that "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980).

## II. SUMMARY OF SECOND AMENDED COMPLAINT

Barber complains that he was placed on an involuntary medication order ("IMO") for Haldol injections in November 2019, while he was housed at the Tecumseh State Correctional Institute, ("TSCI"), and that the IMO has since been continued. Barber claims fourteen named defendants, while acting on behalf of the Nebraska Department of Correctional Services ("NDCS"), violated his right to free speech under the First Amendment and his right to substantive due process under the Fourteenth Amendment. Barber seeks a declaration of that the forced administration of antipsychotic drugs on him is unconstitutional, an injunction against the continued IMO, and the award of compensatory and punitive damages. (Filing 14, ¶¶ 84-88.) The NDCS Director, Scott Frakes, is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages. All other defendants are sued only in their individual capacities, for damages. (Filing 14, ¶¶ 1-8, 13-26, 77, 80.)

Barber alleges that on November 11, 2019, Dr. Brandon Hollister, a psychologist, and Dr. Jeffrey Kasselman, a physician, submitted an application to NDCS's Involuntary Medication Hearing Committee ("IMHC") to administer psychotropic medication based on a diagnosis of "schizoaffective disorder, bipolar type, multiple episodes, currently in acute episode." The IMHC's members included two psychologists, Dr. Sean Thomas and Dr. Jeff Melvin, and a nurse practitioner, Dr. Cynthia Polage. The IMHC held a hearing on November 18, 2019, and issued the IMO. Barber appealed, but the IMHC's decision was upheld on November 22, 2019, by Director Frakes, (Filing 14, ¶¶ 1, 13-18, 34-60.)

Barber alleges that on April 28, 2020, Dr. Natalie Baker, a psychiatrist, and Dr. Meridith Griffin, a psychologist, evaluated him and made a diagnosis of delusional disorder. They applied for a continuation of the IMO. The application was approved in May 2020 by the IMHC, whose members at that time included Dr. Melvin, Dr. Polage, and Dr. Agnes Stairs, a psychologist. (Filing 14, ¶¶ 1, 19-21, 61-68.)

Barber alleges that on October 29, 2020, Dr. Jason Ourada, a psychiatrist, and Dr. Sean Sears, a psychologist, applied for another continuation of the IMO. The

IMHC, whose members now consisted of two psychologists, Dr. Yvonne Westover and Dr. Sarah Hoff, and a physicians' assistant, Dr. Douglas Morin, held a hearing on November 5, 2020, and approved the application. Director Frakes upheld the IMO on appeal on November 13, 2020. (Filing 14, ¶¶ 22-26, 69-72.)

Barber's theory of the case, as outlined in the introductory section of the Second Amended Complaint, is as follows:

> 2.     Barber claims in this matter that the Defendant-applicants used false information in applying to initiate and continue an IMO against Barber. The involuntary medication hearing committee (IMHC) who are several of the defendants, and the Director, went along with these lies despite Barber's denial of the lies and despite that Barber's beliefs for which he was being called delusional and paranoid were plausible, understandable to same-cultured peers, and derive from ordinary life experiences, and there was no evidence conflicting with Barber's beliefs in light of which Barber continued to have such beliefs. Thus the evidence did not actually indicate that Barber was delusional.

> 3.     Barber also alleges in this complaint that Defendant-applicants made up evidence and used evidence from Barber's past having nothing to do with the current beliefs for which he is being diagnosed as delusional to show that he was a danger to himself, others, and gravely disabled. The IMHC and Director went along with this evidence despite Barber's denial of the allegations and despite the fact that most of the allegations did not even satisfy the meaning of "gravely disabled" or "likelihood of serious harm" as defined in the involuntary medication procedures (IMP), which can be found in the Administrative Regulations (AR) 115.12, attachment D.

> 4.     The "Diagnostic and Statistical Manual of Mental Disorders, Volume 5" (DSM-5) is the manual used by practicing doctors to diagnose patients with a mental illness or mental illnesses. It is the accepted standard of practice in the medical profession. The applications indicate that DSM-5 was used in order to diagnose Barber with both schizoaffective disorder and delusional disorder. The diagnosis was based on the belief that Barber was delusional. But Barber's beliefs don't actually demonstrate that he was delusional when considering the meaning of delusions or bizarre delusions as set forth

in DSM-5. Thus, it cannot be said that any of the doctors, nor the Director, actually used accepted judgment or standards in making their decision to apply for, order, and uphold the IMO.

5.    What happened to cause the IMO initiation proceeding was Barber complained via grievance, that his property was being stolen after entering his secure cell and finding that an item that he once possessed was gone. Staff obtained no evidence that the items weren't actually missing and came to Barber's cell and actually found that the items weren't there on a couple of occasions. Barber's property had been stolen, but with no conflicting evidence, Defendants alleged and agreed that Barber is delusional because he believe[d] his property had been stolen. They simply do not want to believe him.

6.    Barber also complained via grievance that because he became sick in a manner which caused several symptoms directly after eating his breakfast at the dining hall he believed that his food was either tampered with or mishandled. No one even attempted to tell him what could have caused those symptoms even though he asked; at least until after he was placed on an IMO. No one gave him any reason to believe the symptoms didn't come from the food and there was no evidence conflicting with Barber's belief that Barber could be reasonably expected to know about. But despite this, Defendants alleged and agreed that Barber's beliefs indicate bizarre delusions.

7.    Barber had no other complaints. And without said complaints Defendants would have had no reason to apply for, order, or uphold an IMO.

8.    In light of the factual allegations of this complaint, Barber could not be said to be mentally ill and dangerous or gravely disabled. He therefore claims that Defendants conspired to deprive him of substantive due process. And because Defendants actions were motivated by Barber exercising his free speech by writing grievances, Barber claims that Defendants also conspired to deprive him of his right to freedom of speech.

(Filing 14, ¶¶ 2-8.)

## III. DISCUSSION

This is a civil rights action brought under 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must allege a violation of rights protected by the United States Constitution or created by federal statute, and also must show that the alleged deprivation was caused by conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Generally, public employees act under color of state law while acting in their official capacities or while exercising their responsibilities pursuant to state law. *Id.* at 50. Director Frakes was clearly acting within his official capacity and exercising his assigned duties in upholding the IMO on appeal. The other defendants are not identified as NDCS employees, but all are alleged to have been serving in their professional capacities "for NDCS" and to have been "acting under color of state law." (Filing 14, ¶¶ 12-16, 83.) The functions they are alleged to have been performing for NDCS suggest this is true.

"A private party is considered a state actor if the alleged deprivation was 'caused by the exercise of some right or privilege created by the [s]tate or by a rule of conduct imposed by the state or by a person for whom the [s]tate is responsible.'" *Sabri v. Whittier All.*, 833 F.3d 995, 1000 (8th Cir. 2016) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). In *West*, for example, the Supreme Court found that a contractual relationship between a private medical provider and a state prison met the "acting under color of state law" requirement to subject the private provider to liability under § 1983. *See* 487 U.S. at 55; *see also Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (a private party may be characterized as a state actor for purposes of § 1983 when "the state has delegated to a private party a power traditionally exclusively reserved to the State," "where a private actor is a willful participant in joint activity with the State or its agents," and "where there is pervasive entwinement between the private entity and the state," with the ultimate conclusion turning on the particular facts of the case (internal quotation marks and citations omitted)).

Liberally construing the allegations of Barber's Second Amended Complaint, all defendants were acting under color of state law.

## A. First Amendment Claim

Barber is asserting a First Amendment retaliation claim against all defendants. "To prevail on a § 1983 claim for retaliation in violation of the First Amendment, [Barber] must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). The second prong's "ordinary-firmness test is designed to weed out trivial matters from substantial violations of the First Amendment." *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020). "Under the third prong, a plaintiff must show that the retaliatory motive was a 'substantial factor' or 'but-for cause' of the adverse action." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (quoting *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010)). In other words, the plaintiff must show he was "singled out because of [his] exercise of constitutional rights." *Id.* (quoting *Baribeau*, 596 F.3d art 481). "The *reason* for the government official's action must have been to prevent the plaintiff from engaging in the protected activity." *Saylor v. Nebraska*, 812 F.3d 637, 646 (8th Cir. 2016), *as amended* (Mar. 4, 2016) (emphasis in original). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019) (emphasis in original).

On the facts alleged in Barber's Second Amended Complaint, the first prong is satisfied. "A prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in this [circuit]." *Nelson v. Shuffman*, 603 F.3d 439, 449-50 (8th Cir. 2010) (citing *Sprouse v. Babcock,* 870 F.2d 450, 452 (8th Cir. 1989)). "Similarly, it has for over [thirty] years been the law of this circuit that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983." *Id.*

The second prong is also met, at least for purposes of initial review. The IMO may constitute an "adverse action," and it may reasonably be concluded that an ordinary person in Barber's position would be deterred from filing grievances after being forced to receive Haldol injections. *See, e.g., L.L. Nelson Enterprises, Inc. v.*

*Cty. of St. Louis*, 673 F.3d 799, 809 (8th Cir. 2012) (noting that "even the selective issuance of parking tickets to a complaining citizen" was held to support a jury's finding of unlawful retaliation in *Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir. 2003)).[2]

With respect to the third prong, it is alleged that "but for the fact that Barber had [written] those grievances, Defendants would not have applied for, ordered, and upheld an IMO, claiming that a delusional thought process was why Barber was misbehaving. Given that Defendants should have reasonably known that Barber's complaints could not be construed as bizarre delusions, it is only reasonable to conclude that Defendants wished to have Barber cease making these plausible complaints, and cease other behaviors that ultimately did not demonstrate that Barber posed a significant risk of harm to himself or others." (Filing 14, ¶ 80.)

This case is comparable to *Oliver v. Roquet*, 858 F.3d 180 (3d Cir. 2017), where it was alleged that "a state-employed medical professional charged with assessing the clinical progress of a civilly committed sexually violent predator considered this detainee's First Amendment activities in connection with her recommendation that he not advance to the next phase of his treatment program." *Id.* at 184. The detainee alleged that he was retaliated against "for his participation in legal activities of two general types—those he conducted on his own behalf, and those he conducted on behalf of other STU [Special Treatment Unit] residents." *Id.* at 186. The medical professional expressed concern that the detainee was "legalistically focused" and that his legal activities were so time-consuming they could interfere with treatment, which had been a problem in the past when he was a

---

[2] "[I]n most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law." *Bennie v. Munn*, 822 F.3d 392, 398 (8th Cir. 2016) (quoting *Bell v. Johnson,* 308 F.3d 594, 603 (6th Cir. 2002)). "Except when the alleged harassment is so inconsequential that even allowing a claim would trivialize the First Amendment, … the determination of whether government action would chill an ordinary person's speech is a matter for the factfinder." *Id.* at 399 n.1 (internal quotation marks omitted).

prison inmate. *Id.* at 187. On interlocutory appeal from the district court's denial of the medical professional's motion to dismiss the detainee's retaliation claim based on qualified immunity, the Third Circuit reversed and remanded with directions to dismiss the claim, stating: "Because the detainee has pleaded facts reflecting that the medical professional based her recommendation on the medically relevant collateral consequences of his protected activity, but has not sufficiently pleaded that the recommendation was based on the protected activity itself, the detainee has not alleged the necessary causation to state a prima facie case of retaliation." *Id.* at 184-85. "[A] prima facie showing of causation requires more than the allegation that the professional based a medical decision on symptomology that happened to relate in some way to a patient's protected activity. There must be particular facts alleged that allow the court to reasonably infer it is the protected activity itself, and not simply medically relevant behavior associated with that activity, that formed the basis of the defendant's adverse action." *Id.* at 192.[3]

The court is not required to accept the truth of Barber's conclusory allegations that that defendants' actions were retaliatory in nature. *See Twombly*, 550 U.S. at 555 (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Nor is the court required to consider the defendants' actions as a whole. To the contrary, in seeking to recover damages in a § 1983 action, a plaintiff

_____

[3] In so holding, the Third Circuit recognized that "there may be cases where a medical report purporting to focus only on the collateral consequences of a detainee's First Amendment activity could be sufficient to establish a prima facie case of retaliation where the plaintiff is able to plead 'consideration plus,'—i.e., where, in addition to consideration of the protected activity by way of its association with medically relevant conduct, there are specific factual allegations supporting an inference that the adverse action was based on the protected activity itself." *Oliver*, 858 F.3d. at 194. "Consideration plus" may exist, for example, where the complaint contains "specific factual allegations suggesting that the collateral consequences were fabricated, that the defendant had communicated anger or frustration with the protected activity itself or had threatened to take action against the plaintiff, or that the collateral consequences relied upon were irrelevant to the medical judgment in question." *Id.*

"must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Barber first alleges that Dr. Hollister and Dr. Kasselman violated his First Amendment rights when they applied for the IMO in November 2019:

> 48. They were mainly alleging that the above mentioned grievances were bizarre delusions. But because the grievances were plausible, understandable to same culture peers, and derive from ordinary life experiences the grievances were not bizarre delusions [as defined the DMS-5].…

> 49. They alleged that Barber 'verbally aggressed toward staff when he was delusional about peers stealing from him.' But in order, to have been a delusion, as indicated above, there would have to be clear and reasonable evidence that Barber's property was not stolen…. So, because there was no clear and reasonable evidence contradicting Barber's belief there should have been no IMA asserting that Barber is delusional based on the fact that he believes someone stole his property….

> 50. They alleged that Barber expressed concerns about contaminated water and food poisoning and stated: 'Thus, he presents with a risk of harm to himself through failing to drink and eat properly.' But Barber hadn't complained about the water since 2016, when he was confused about the cause of his involuntary muscle twitches (fasciculations)…. [B]ecause there was no clear and reasonable contradicting evidence that the symptoms did not come from the food or exist they shouldn't have used Barber's complaint for purposes of an IMA….

> 51. Dr. Hollister and Dr. Kasselman made a bunch of false allegations that Barber was a danger to himself and others, and gravely disabled, mainly based on the complaints of theft and food tampering…. [B]ecause Barber's complaints can't be reasonably construed as delusions, the alleged acts of Barber couldn't be due to the diagnosed mental illness….

52.     The application also alleges that Barber believed that TSCI staff were controlling his thoughts. This was false. Barber never told anybody that TSCI staff were controlling his thoughts. The application also falsely alleges that Barber claimed that his food was poisoned.

53.     With regard to the allegation that Barber was a danger to himself, the applicants alleged the above and the following: 'Peers may aggressively retaliate against him and staff may use force' because Barber has 'wandered into unauthorized areas and verbally aggressed toward staff when delusional' about thefts of his property….

54.     With regard to the allegation that Barber was a danger to others, they alleged the following: Barber 'has thrown fluid on staff during potentially delusional concerns about canteen.' Barber 'has slammed doors and hatches when upset about delusional concerns about peers who stole from him;' Barber 'has verbally aggressed toward staff.' Barber 'has endorsed aggressive ideation towards peers who he believed stole from him.' Barber 'has often presented as agitated when delusional.' And that Barber 'presents at an increased risk of aggressiveness, because of his delusional and paranoid thought process.'…

55.     With respect to the allegations that Barber is gravely disabled, they alleged the following: Barber 'has experienced somatic delusions and has failed to follow staff[']s directives because of those somatic delusions. He has endorsed urgent physical problems that weren't verified by subsequent medical evaluation and appeared to relate to somatic delusions. Thus, his delusional and paranoid thought process has appeared to impact his physical functioning.' Barber 'has refused to lock down when in the general correctional setting and has refused promotions to less restrictive settings when delusional. He has experienced difficulties with interactions with peers and staff when delusional. He has shown problems with eating appropriately when delusional. Thus, his delusional and paranoid thought process has appeared to inhibit his ability to succeed in less restrictive settings and work towards promotions and parole.'…

56.     The day after the IMO hearing Barber spoke with Dr. Hollister about his grievances. Dr. Hollister believed that it was

reasonable to write grievances if there was reasonable beliefs of theft. But he thought they were bizarre delusions because staff did not understand them. But Dr. Hollister said they were legible and could be understood by him. He stated that because Barber was on an IMO because he alleged theft in 2016 he concluded that these current allegations were delusions.

57.     Dr. Hollister stated that because it is possible that an abdomen becomes painful, and that eyes become blurry, and a person[']s ears ring, it was reasonable to believe that someone may have tampered with or mishandled the food. But he stated that he had called it a bizarre delusion in his application because Barber had been on an IMO in 2016 to 2017 for concerns having to do with 'poison' in his food. And because medical reported that Barber believed that NDCS had been putting thoughts in his head and controlling his mind he (Dr. Hollister) called Barber's current beliefs about his food bizarre delusions. He stated that, after speaking with Barber, he believed there was a mix-up with medical.

58.     Dr. Hollister had decided to apply for an IMO not because he believed Barber's beliefs are clearly implausible, not understandable to same-cultured peers, and do not derive form [sic] ordinary life experiences, he did this not because there was clear and reasonable evidence that contradicted Barber's current beliefs. He did this because Barber was placed on an IMO three years prior to Barber's current concerns which have nothing to do with Barber's past assertions for which he was placed on an IMO. He also did this because medical reported that Barber was having thoughts put in his head. Dr. Kasselman was in agreement with Dr. Hollister with respect to applying for an IMO for those reasons. But they reasonably knew that they must have examined Barber's current beliefs for plausibility before they diagnosed Barber as delusional. So, the fact that they based their decision on Barber's IMO from three years ago and on a report that Barber believed his thoughts were being controlled, and did not base their decision on facts indicating that Barber's current beliefs about theft and his food made him delusional as defined in DSM-5, and because Barber's beliefs clearly did not indicate a delusional thought process, Dr. Hollister and Dr. Kasselman falsely diagnosed Barber with schizoaffective disorder….

(Filing 14, ¶¶ 48-58.)

These allegations fail to create a reasonable inference that Dr. Hollister and Dr. Kasselman applied for the IMO in retaliation for Barber filing grievances. In the first place, the grievances were not directed at either of these defendants, or even at medical staff, so there is no obvious retaliatory motive. Second, although Barber disputes that the grievances provide evidence of delusional thinking on his part, because there allegedly was no "clear and reasonable evidence" to contradict his beliefs about property theft and food tampering (Filing 14, ¶¶ 49, 50), the grievances were determined by others to be without merit.[4] Third, it is apparent that Dr. Hollister

---

[4] Barber alleges that "[w]hile housed at TSCI, [he] was apparently being harassed by a person or people within his unit. Sometimes Barber would leave his cell, secure the door, and when he returned there would be an item missing, such as a clothing item, his headphones, his prison issued identification card, and other small items." (Filing 14, ¶ 34.) He wrote informal grievances, "simply [to] explain that he left his cell, closed the door (when cell doors close they automatically lock), and when he came back to the cell, it was closed, but when he entered a particular item had been missing." (Filing 14, ¶ 35.) "A staff member checked the cell when Barber claimed that his headphones were stolen, and a staff member checked the cell when Barber claimed that his state issued sweater was stolen. They did not find the items …. Other than those complaints, no one came to check Barber's cell for stolen items." (Filing 14, ¶ 36.) "The responses to the grievances would always be similar: that the [video surveillance] camera was checked and the only person in the cell around the time specified was Barber, or no one. But because Barber was not in the cell at the time specified and because property of his was missing, he concluded that the grievance response was false, and therefore, he would write a step one and step two grievance, both of which would simply concur with the informal grievance response." (Filing 14, ¶ 37.) It is further alleged that "[o]ne day, directly after eating breakfast, Barber experienced severe abdominal pain. Moments after this he experienced loud ringing in his left ear, blurred vision, and lightheadedness. He requested emergency medical assistance but received none. And when he was finally given an opportunity to see medical personnel several days later he was not given any information on how those symptoms could have occurred.…" (Filing 14, ¶ 38.) Barber "grieved this incident and for safety reasons stopped eating at the chow hall and started eating only items on the canteen food list…." (Filing 14, ¶ 39.) "The grievance responses did not provide Barber with clear and reasonable evidence that the symptoms didn't come from the food. They denied that anything was wrong with

13

and Dr. Kasselman also relied on other evidence in applying for the IMO. Indeed, Barber specifically alleges that they "decided to apply for an IMO … because Barber was placed on an IMO three years prior to Barber's current concerns" and "because medical reported that Barber was having thoughts put in his head." (Filing 14, ¶ 58.) The application also stated, among other things, that Barber was verbally aggressive toward staff and slammed doors in hatches while complaining about the suspected thefts, and threw liquid at staff while complaining about the food. (Filing 14, ¶¶ 53, 54.) The facts alleged do not provide sufficient support for Barber's conclusion that Dr. Hollister and Dr. Kasselman acted because they "wished to have Barber cease making these plausible complaints." [5] (Filing 14, ¶ 80.) Thus, no plausible claim for relief is stated against these defendants.

There are no facts alleged in the Second Amended Complaint to show that the IMHC approved the application, or that the Director upheld the IMO, because of the fact that Barber filed grievances. It is merely alleged in general terms that these defendants "went along" with false or irrelevant evidence that was provided by Dr. Hollister and Dr. Kasselman in support of the application. (See Filing 14, ¶¶ 3, 4, 49-51, 58.) Again, because it cannot reasonably be inferred that a retaliatory motive was a 'substantial factor' or 'but-for cause' of their actions, no plausible claim for relief is stated against the IMHC members or the Director.

Barber next claims that Dr. Baker and Dr. Griffin violated his First Amendment rights when, after evaluating him on April 28, 2020, they applied for a continuation of the IMO. However, there are no facts alleged to show they did so because Barber had filed grievances six months earlier. "At this evaluation, Barber explained his situation regarding his complaints about his symptoms after eating his

---

the food and told Barber that he should continue eating at the dining hall. Barber did not trust the grievance responses, so he continued to buy canteen instead." (Filing 14, ¶ 40.) It is alleged that Dr. Hollister visited Barber after he had been eating only canteen food for a while, and said "there were some concerns about Barber not eating." (Filing 14, ¶ 43.)

[5] Barber also alleges that the defendants "wished to have Barber … cease other behaviors that ultimately did not demonstrate that Barber posed a significant risk of harm to himself or others" (Filing 14, ¶ 80), but those behaviors are not protected by the First Amendment.

food that day and theft of his property…. Dr. Baker thought that Barber was reasonable in complaining about these things, …. But Barber also mentioned his ongoing fasciculations. They just decided to call this a somatic delusion." (Filing 14, ¶ 62.) "They also said that he had a history of persecutory delusions '(e.g., NDCS staff members poison his food).' But at the evaluation, Barber said he didn't know what, if anything, was done to his food. He said that all he knew was that directly after eating the food he became ill." (Filing 14, ¶ 63.) Barber alleges that Dr. Baker and Dr. Griffin "went along with all the false allegations from the initial application." (Filing 14, ¶ 64.)

Similarly, there are no facts alleged to show that the IMHC members approved the continuation of the IMO in May 2020 because of the grievances that Barber had filed. "At the involuntary medication hearing, Barber explained why he believed that someone or people were stealing his property and why he believed that his food may have been tampered with…. He further denied being aggressive towards staff and inmates." (Filing 14, ¶ 65.) Barber alleges that the IMHC "simply took the side of the applicants in continuing the IMO despite evidence indicating that Barber is not mentally ill and dangerous or gravely disabled." (Filing 14, ¶ 67.) He also alleges that the Director's decision to uphold the IMO was erroneous because "the record clearly doesn't demonstrate that Barber is mentally ill and dangerous or gravely disabled." (Filing 14, ¶ 67.)

Finally, Barber claims that Dr. Ourada and Dr. Sears violated his First Amendment rights when they applied for another continuation of the IMO in October 2020. It is alleged that "Dr. Ourada believed Barber was rational with respect to his complaints regarding theft and possible food tampering," but that he and Dr. Sears relied on "the false allegations from the initial IMA," while adding that Barber had made "verbal threats." (Filing 14, ¶ 69.) And, as before, there are no facts alleged to show that the IMHC members approved this continuation of the IMO in retaliation for Barber filing grievances one year earlier, or that the Director approved the Committee's action because of a retaliatory motive. "At the hearing, Barber explained his situation regarding his beliefs regarding theft and his food that day. He denied threatening anybody with physical harm …." (Filing 14, ¶ 70.)

In summary, even if the doctors who applied for the initial IMO may have acted, in part, based upon an erroneous belief that Barber was delusional in thinking his property was being stolen from a locked cell and his cafeteria food was being tampered with, there are no facts alleged from which it may reasonably be inferred that the doctors applied for the IMO because of the fact that Barber expressed these thoughts by filing grievances. The actions taken by the other defendants are even further removed from Barber's protected activity. Essentially, Barber "contends that by alleging a medical professional considered protected activity at all, even if only as a symptom of or giving rise to medically relevant behaviors, a plaintiff can satisfy [the] causation prong at the pleading stage. That cannot be, and is not, the law." *Oliver*, 858 F.3d at 191.

## B. Substantive Due Process

The constitutional right to substantive due process protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them. *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007). The "core of the concept [of substantive due process is] protection against arbitrary action" by the government. *Putnam v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003) (quoting *Lewis,* 523 U.S. at 845). "[Supreme Court] cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense." *Id.* (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 128 (1992)); *see Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) ("Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise (citation omitted)). "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Mitchell v. Dakota Cty. Soc. Servs*., 959 F.3d 887, 898 (8th Cir. 2020) (quoting *Folkerts v. City of Waverly*, 707 F.3d 975, 981 (8th Cir. 2013) (emphasis in original)). "Whether conduct shocks the conscience is a question of law." *Id.*; *Terrell v. Larson,* 396 F.3d 975, 981 (8th Cir.2005) (en banc).

"[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. It is, on the contrary, behavior at the other end of the

culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849 (citation omitted). "A substantive due process claim invariably 'demands an exact analysis of circumstances before any abuse of power is condemned." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006) (quoting *Lewis*, 523 U.S. at 850). "Whether conscience-shocking conduct has occurred is 'tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." *Norris*, 494 F.3d at 638 (quoting *Lewis*, 523 U.S. at 850 (internal quotation marks and citations omitted)).

The court "may also consider conduct that evinces a 'deliberate indifference' to protected rights of [the plaintiff], if [the defendants] had an opportunity to consider other alternatives before choosing a course of action." *Putnam*, 332 F.3d at 548; *see Neal v. St. Louis County Bd. of Police Comm'rs,* 217 F.3d 955, 958 (8th Cir. 2000) ("[W]here a state actor is afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, the chosen action will be deemed conscience shocking if the action was taken with deliberate indifference." (internal quotations omitted)).[6] *See also Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016) ("The lower deliberate indifference standard 'is sensibly employed only when actual deliberation is practical.'" (quoting *Lewis*, 523 U.S. at 848-49). "For conduct to amount to deliberate indifference, the state actor must have subjectively

---

[6] In *Van Orden v. Stringer*, 937 F.3d 1162 (8th Cir. 2019), *cert. denied sub nom. Orden v. Stringer*, 140 S. Ct. 1146 (2020), the State argued that "something more akin to an intent-to-harm standard may apply when officials, after deliberating, are forced to choose among competing, legitimate interests." *Id.* at 1170; s*ee Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 541-42 (6th Cir. 2008); *Matican v. City of New York*, 524 F.3d 151, 158-59 (2d Cir. 2008); *Schieber v. City of Philadelphia*, 320 F.3d 409, 419-20 (3d Cir. 2003). The Court of Appeals found it unnecessary to resolve the dispute over the applicable standard because the alleged actions of the defendant officials did not shock the conscience under the lesser "deliberate indifference" standard.

understood his actions as creating a substantial risk of a constitutional deprivation. *Skokos v. Rhoades*, 440 F.3d 957, 962 (8th Cir. 2006).

The Supreme Court has held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Morgan v. Rabun*, 128 F.3d 694, 697 (8th Cir. 1997) (quoting *Washington v. Harper,* 494 U.S. 210, 227 (1990)). In a case involving a substantive due process challenge to an involuntary medication order, the court must "start from a presumption that the decisions made by professionals are correct." *Id.* (citing *Youngberg v. Romeo,* 457 U.S. 307, 323 (1982)). "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Youngberg,* 457 U.S. at 323.

Barber alleges that "Defendant-applicants made up evidence and used evidence from Barber's past having nothing to do with the current beliefs for which he is being diagnosed as delusional to show that he was a danger to himself, others, and gravely disabled." (Filing 14, ¶ 3). Barber also alleges that they, and all other defendants, "failed to exercise professional judgement in finding that Barber was indeed delusional" because "in light of the standards set forth in the IMP with regard to an individual being gravely disabled or posing a likelihood of serious harm and the fact that the allegations never met those standards (and to the extent. that they did, they were all lies and Barber denied them)." (Filing 14, ¶ 77.)

These allegations, along with other, more specific allegations contained in the Second Amended Complaint, are sufficient to state a plausible claim for relief against Dr. Hollister and Dr. Kasselman for deliberate indifference in applying for the IMO. It is alleged that they "made a bunch of false allegations that Barber was a danger to himself and others, and gravely disabled, mainly based on the complaints of theft and food tampering. But these allegations fell short of the standards set forth in the IMP …. The application also alleges that Barber believed that TSCI staff were controlling his thoughts. This was false.… The application also falsely alleges that Barber claimed that his food was poisoned." (Filing 14, ¶¶ 51, 52.) Barber alleges that Dr. Hollister acted because "Barber was placed on an IMO three years prior to Barber's current concerns which have nothing to do with Barber's past assertions

for which he was placed on an IMO" and "because medical [falsely] reported that Barber was having thoughts put in his head." Dr. Kasselman allegedly "was in agreement with Dr. Hollister with respect to applying for an IMO for those reasons." Thus, Barber concludes, "the fact that they based their decision on Barber's IMO from three years ago and on a report that Barber believed his thoughts were being controlled, and did not base their decision on facts indicating that Barber's current beliefs about theft arid his food made him delusional as defined in DSM-5, and because Barber's beliefs clearly did not indicate a delusional thought process, Dr. Hollister and Dr. Kasselman falsely diagnosed Barber with schizoaffective disorder." (Filing 14, ¶ 58.)

For purposes of initial review, Barber's allegations are also sufficient to state a plausible claim for relief against Dr. Baker and Dr. Griffin, for deliberate indifference in applying for the first continuation of the IMO. In addition to alleging that these defendants "went along with all the false allegations from the initial application," Barber claims "they decided to lie in order to continue the IMO" by stating he "had a history of persecutory delusions." (Filing 14, ¶¶ 63, 64.) Barber also alleges they "decided to lie" about his ongoing fasciculations, labeling this legitimate physical complaint a "somatic delusion," because "they otherwise would have had no real reason to continue the IMO." (Filing 14, ¶ 62.)

Similarly , Barber's allegations are sufficient to state a plausible claim for relief against Dr. Ourada and Dr. Sears, for deliberate indifference in applying for the second continuation. It is alleged these defendants "contended that Barber was mentally ill based on what 'documentation indicates' about Barber's past conduct," while adding "that Barber has made 'verbal threats'" without "specify[ing] who Barber threatened." Barber calls this a "false allegation." (Filing 14, ¶ 69.)

However, Barber's allegations fail to state a plausible claim for relief against the IMHC members for approving the IMO or its continuations, or against Director Frakes for upholding the committees' orders on appeal. The mere fact that Barber appeared at hearings and denied the truthfulness of certain information contained in the applications does not create a reasonable inference that these defendants subjectively understood there was a substantial risk that the IMO applications were

not supported by reliable evidence.[7] And because Director Frakes lacks medical expertise, he cannot be held liable for the medical defendants' diagnostic and treatment decisions. *See Ditter v. Nebraska Dep't of Corr. Servs.*, No. 4:16CV3159, 2018 WL 2184454, at *8 (D. Neb. May 11, 2018) (citing cases), *aff'd*, 750 F. App'x 508 (8th Cir. 2019). His role was limited to determining whether institutional procedures were followed. Consequently, Director Frakes will remain a defendant only in his official capacity, with respect to Barber's requests for declaratory and injunctive relief.

## IV. CONCLUSION

Barber's Second Amended Complaint fails to state a viable First Amendment retaliation claim against any Defendant, but the case will be allowed to proceed to service of process against certain Defendants on the substantive due process claim. Barber is cautioned this is only a preliminary determination, which is based solely on the allegations contained within the Second Amended Complaint. This is not a determination on the merits of his claim or any potential defenses to it.

IT IS THEREFORE ORDERED:

1.     This case will proceed to service of process only with respect to Plaintiff's substantive due process claim, and only as against the following Defendants: (1) Dr. Brandon Hollister, (2) Dr. Jeffery Kasselman, (3) Dr. Natalie Baker, (4) Dr. Meridith Griffin, (5) Dr. Jason Ourada, (6) Dr. Sean Sears, and (7)

---

[7] Barber alleges that the defendants conspired to deprive him of substantive due process. (Filing 14, ¶¶ 8, 10, 83.) In order to state a claim for conspiracy under 42 U.S.C. § 1983, the "plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (internal citation omitted). The first element "requires allegations of specific facts tending to show 'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010). No facts are alleged in the Second Amended Complaint to show that such an unlawful agreement was reached between or among any of the defendants.

Scott Frakes, in his official capacity as Director of the Nebraska Department of Correctional Services.

2.      Plaintiff's First Amendment claim, as alleged against all Defendants, is dismissed without prejudice.

3.      Plaintiff's substantive due process claim is dismissed without prejudice as alleged against the following Defendants: (1) Dr. Sean Thomas, (2) Dr. Jeff Melvin, (3) Dr. Cynthia Polage, (4) Dr. Agnes Stairs, (5) Dr. Yvonne Westover, (6) Dr. Sarah Hoff, (7) Dr. Douglas Morin, and (8) Scott Frakes, in his individual capacity. These Defendants shall no longer be parties to this action, and may be "terminated" by the Clerk of the Court.

4.      For service of process on Defendant Scott Frakes, **in his official capacity**, the Clerk of the Court is directed to complete a summons form and a USM-285 form using this address:

> Office of the Nebraska Attorney General
> 2115 State Capitol
> Lincoln, NE 68509

The Clerk shall then forward these completed forms, together with a copy of the Second Amended Complaint (Filing 14) and a copy of this Memorandum and Order, to the Marshals Service for service upon said Defendant by certified mail or other authorized method.[8] *See* Fed. R. Civ. P. 4(j)(2); Neb. Rev. Stat. § 25-510.02.

---

[8] Pro se litigants proceeding in forma pauperis are entitled to rely on service by the United States Marshals Service. *Wright v. First Student, Inc.*, 710 F.3d 782, 783 (8th Cir. 2013). Pursuant to 28 U.S.C. § 1915(d), in an in forma pauperis case, "[t]he officers of the court shall issue and serve all process, and perform all duties in such cases." *See Moore v. Jackson*, 123 F.3d 1082, 1085 (8th Cir. 1997) (language in § 1915(d) is compulsory); Fed. R. Civ. P. 4(c)(3) (court must order that service be made by United States Marshal if plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915). *See, e.g.*, *Beyer v. Pulaski County Jail*, 589 Fed. App'x 798 (8th Cir. 2014) (unpublished) (vacating district court order of dismissal for failure to prosecute and directing district court to order the Marshal to seek

5.     For service of process on Defendants Dr. Brandon Hollister, Dr. Jeffery Kasselman, Dr. Natalie Baker, Dr. Meridith Griffin, Dr. Sean Sears, and Dr. Jason Ourada, **in their individual capacities**, the Clerk of the Court is directed to complete a summons form and a USM-285 form for each Defendant using these addresses:

Dr. Brandon Hollister
Tecumseh State Correctional Institution
2725 Hwy 50
Tecumseh, NE 68450

Dr. Jeffrey Kasselman[9]
Tecumseh State Correctional Institution
2725 Hwy 50
Tecumseh, NE 68450

Dr. Natalie Baker
Meridian Mental Health
6910 Pacific Street #100
Omaha, Nebraska 68106

Dr. Meredith Griffin[10]
Blue Valley Behavioral Health
3901 Normal Blvd., Suite 201
Lincoln, Nebraska 68506

Dr. Sean Sears
4545 S 86th Street
Lincoln, NE 68526

_____

defendant's last-known contact information where plaintiff contended that the jail would have information for defendant's whereabouts); *Graham v. Satkoski*, 51 F.3d 710, 713 (7th Cir. 1995) (when court instructs Marshal to serve papers for prisoner, prisoner need furnish no more than information necessary to identify defendant; Marshal should be able to ascertain defendant's current address).

[9] The Clerk of the Court is also directed to correct the spelling of Dr. Kasselman's first name on the docket sheet.

[10] The Clerk of the Court is also directed to correct the spelling of Dr. Griffin's first name on the docket sheet.

Dr. Jason Ourada
Fremont Health Medical Center
450 E 23rd Street
Fremont, NE 68025

The Clerk shall then forward these completed forms, together with a sufficient number of copies of the Second Amended Complaint (Filing 14) and of this Memorandum and Order, to the Marshals Service for service upon said Defendants by certified mail or other authorized method. *See* Fed. R. Civ. P. 4(e); Neb. Rev. Stat. § 25-508.01(1).

6.    The United States Marshal shall serve all process in this case without prepayment of fees from Plaintiff.

7.    Federal Rule of Civil Procedure 4(m) requires service of the complaint on a defendant within 90 days of filing the complaint. However, Plaintiff is granted, on the court's own motion, an extension of time until 90 days from the date of this Memorandum and Order to complete service of process.

8.    The Clerk of Court is directed to set the following pro se case management deadline: July 27, 2021—check for completion of service of process.

9.    Plaintiff shall keep the court informed of his current address at all times while this case is pending. Failure to do so may result in dismissal.

Dated this 28th day of April, 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge